**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ROBERT LUCAS,                :
                                 :      CIVIL ACTION
              Plaintiff,      :
                                 :
      v.                         :
                                 :
CITY OF PHILADELPHIA,   :
                                 :      NO.  11-4376
              Defendant.    :

**MEMORANDUM**

BUCKWALTER, S. J.                                     May 17, 2013

      Currently pending before the Court is Defendant City of Philadelphia's ("Defendant" or "the City") Motion for Summary Judgment. For the following reasons, the Motion is granted in part and denied in part.

## I.    STATEMENT OF FACTS

      Plaintiff Robert Lucas, an African-American male, was hired by the City of Philadelphia Water Department on February 17, 1998. (Def.'s Mot. Summ. J., Ex. 1.) His initial title was Water Treatment Plant Operator assigned to the Southwest Water Treatment Plant. (Id., Ex. 2.) During his first probationary period running through August 17, 1998, Plaintiff was observed to be on time and ready to work with his work habits "up to standards." (Id., Ex. 3.) In 1999, Plaintiff was transferred to the Instrumentation Video Department at Fox Street to participate in a training program for a certification in instrumentation. (Dep. of Robert Lucas ("Lucas Dep."), 9:15–10:4, Jan. 17, 2013.) When he completed the training and received his certification, he was assigned to that department and became a Maintenance Apprentice I. (Id. at 9:22–10:2; Def.'s

Mot. Summ. J., Ex. 4.)  Plaintiff then received a promotion in June 2001 to Instrumentation

Technician I.  (Def.'s Mot. Summ. J., Ex. 5.)  At that time, his immediate supervisor was Harry

Adams.  (Lucas Dep. 13:7–11.)

In June 2002, Plaintiff was promoted to an Electronic Technician II.  (Id., Ex. 6.)  Shortly

thereafter, Francis Francesco became his group leader.  (Dep. of Francis Francesco ("Francesco

Dep."), 17:13–24, Feb. 4, 2013.)  Upon completion of his probationary period as an Electronic

Technician 2, Plaintiff received a Performance Report which (a) noted that he received special

training on NASSCO codes and procedures; (b) gave him a "satisfactory" performance rating;

and (c) complimented his work.  (Def.'s Mot. Summ. J., Ex. 7.)  Plaintiff's duties as Electronic

Technician 2 involved running a video camera into the sewer systems of the city to explore any

type of imperfections, examining and inspecting the pipe installation to make sure everything

was properly done, and then logging any defects in the sewer.  (Id. at 15:5–11; Francesco Dep.

11:9–12.)  In addition, he would fix the cameras, work on the truck, receive training involving

everything relating to his equipment, and preserve the function of his equipment.  (Lucas Dep.

15:12–16.)  On occasion, a technician would have to go into a manhole.  (Francesco Dep.

108:21–109:2.)  The technicians had to prepare reports from their work, which, at the pertinent

time, Francesco would review and correct and then pass on to the engineers.  (Id. at 111:4–19.)

Plaintiff's problems began in January 2008 when Francesco spoke with him about

traveling to an area of the city where he was not assigned.  According to the lunch policy for

Plaintiff's unit, employees had to remain within five minutes or five miles of their work area, and

were given half an hour for lunch, plus fifteen minutes to wash up and travel.  (Id. at

109:23–110:12.)  Plaintiff's January 2008 trip log indicated that he was finished and left the site

at 12:30 and went to Broad and Olney Ave. for lunch. (Def.'s Mot. Summ. J., Ex. 8.) When Plaintiff explained that the location was within ten minutes of his job and that he made a mistake on his sheet by changing his departure time to 1:00 p.m., Francesco reminded him that a city vehicle was only to be taken five minutes from the job site or five minutes off his route between jobs. (Id.) The following day, after Francesco reviewed Plaintiff's camera report, he determined that Plaintiff had actually finished at 12:00 p.m. and that he dragged the storm tractor back upside down. (Id.)

On February 7, 2008, Plaintiff filed a grievance with his superintendent, George Collier. (Def.'s Mot. Summ. J., Ex. 9.) In his grievance, he stated "Have me working on same truck with person working out of class (over), above without proper title, over top of myself working out of class (under) with me hav[]ing the title. Also have person in yard (in house) working on electronic equipment (motor drives) without have title (with me not having working on equipment with title. Being able to refuse to work with this person in this capacity. And be able to go to demos work on equipment in house and receive training like the other techs." (Def.'s Mot. Summ. J., Ex. 9; Francesco Dep. 24:3–20.) George Collier responded to the grievance on February 13, 2008 and stated, "There is no violation of the contract here. The title of the person referenced is Sewer Maint[enance] Inspector. He was performing sewer inspections. Mr. Lucas was assisting. Mr. Lucas has received all proper training." (Def.'s Mot. Summ. J., Ex. 9.)

Plaintiff claims that the first racist comments were made to him by Francesco during the 2008 presidential election. Plaintiff's synopsis of the events is as follows:

Q.      Did you ever hear Mr. Francesco make racist comments to you?

A.      Yes.

3

Q.     What did he say?

A.     Beginning with the presidential election, when Barack Obama was running for president, he made certain comments about, you know, being black, being president, and, you know, his thoughts and his beliefs on that. And me myself being a democrat, I was for Barack Obama, and he, in turn, developed some sort of—the term I'm trying to use escapes me, but it became a war of attrition with him and this, you know, Barack Obama being black and then it became synonymous with me being black, and I think it affected the way he treated me in various ways.

Q.     What kinds of comments did he make to you about being an Obama supporter?

A.     Well, stuff like that oh, you believe that bull and you're drinking the Kool Aid, and, you know, all different kinds of stuff. Basically a lot of the stuff he was spewing at me was coming from listening to in his office Rush Limbaugh, because he is basically a tape recorder repeating stuff that he would say. And when I worked with Douglas Barber, the other black guy that worked with me, he was more like—he played Rush Limbaugh, and that's why they got along so well, because he supported his beliefs. As a matter of fact, he had me work with him one day, and he told Douglas Barber to turn on Rush Limbaugh on the radio in the truck and turn it up louder. And he also made a comment to me that I should be more like a Michael Steel who was a black republican and a tea party person. And, you know, I tried not to get into that with him, but it became an obsession with him. And it affected his behavior towards me, thus affected my job assignments and a lot of other things.

Q.     Okay. Why do you think that Mr. Francesco's conduct toward you was motivated by race and not political affiliation?

A.     Because Barack Obama was black and I was black.

Q.     How did Mr. Francesco know that you supported Obama?

A.     I told him.

Q.     What specific comments did Mr. Francesco make that indicated that he was discriminating against you on the basis of race?

A.     Well, just basic stuff, like I said, that's synonymous with Barack Obama. He kind of like made me a surrogate Obama in his workplace where he took out

4

> his displeasures of what was going on in the political arena and the race arena. And I wasn't like—you know, I wasn't a Michael Steel guy, I wasn't a black republican, and I didn't agree with a lot of the things that he said. And, you know, some people don't have the—you should have the right to disagree, you know, without being disagreeable, and I didn't get that from him. I got, you know, the brunt of a lot of things.
>
> Q. Do you recall the specific comments that he made to you that indicated that he was racist?
>
> A. Well, like I said earlier, you know, when I would make a comment, he would say, well, I'm drinking the Kool Aid, you know, which is synonymous with a lot of the things—you know, Michael Steel comments, Rush Limbaugh comments, Glen Beck comments. You know, I would have to hear that almost on a daily basis. And didn't agree with him. I actually went to him and told him that I didn't want to discuss that in the workplace, but he continued on. He ignored, you know, me imploring not wanting to discuss that, because I feel there is no place in the workplace for that. And I had to come there to work. I didn't come there to talk about my race, you know, or my political affiliation.
>
> Q. Who started the political conversations between you and Mr. Francesco?
>
> A. Frank did.

(Lucas Dep. 52:20–56:7.) When later asked whether Francesco did or said anything else that indicated that he had some racial motivation, Plaintiff remarked that he "notice[d] something on his computer referring to President Obama, you know a bucket of fried chicken and jar of Kool Aid and some sort of discriminatory references on his computer desktop and his radio listening to Rush Limbaugh and Glen Beck constantly everyday." (Id. at 108:20–109:2.) Plaintiff could not identify any other comments by Francesco to him personally, outside discussions about Obama, that were racist. (Id. at 56:8–57:11.)

Subsequently, on March 16, 2009, Francesco again had to speak with Plaintiff about traveling away from his work district to take care of personal business. (Def.'s Mot. Summ. J.,

Ex. 10.) According to Francesco's written notations, Plaintiff's job assignment was in South Philly on Hartranft Street and he traveled to Southampton Road in the Northeast, "wasting an entire afternoon of city time and using city gas." (Id.) He was told that the next time that happened, he would be given a verbal warning. Yet again, on October 23, 2009, Plaintiff about travelled away from his work district during lunch. (Id. at Ex. 11.) Plaintiff was questioned about that incident and he responded that although he did not remember why he away from his district, he had taken a shortcut to get there. (Id.) Francesco directed him to come up with a reason for being there and also issued him a verbal warning. (Id.)

Around this same period in October, Harry Adams retired and Francesco was promoted to Electronics Equipment Supervisor of the Collector Systems Division, Flow Control Unit, CCTV section. (Francesco Dep. 8:7–23.) Lucas alleges that with this promotion came some difficult behavior from Francesco. First, he indicated that Mr. Francesco would berate him and was always giving him assignments first:

A. Okay. Well, Mr. Adams kind of passed the torch to Mr. Francesco, and that's when a lot of the, you know berating started. And I filed a complaint with the Human Relations Commission based on the discrimination and it got worse. It was almost a retaliatory response after they got a response from the Human Relations Commission that I had filed a discrimination case against them, it got worse.

Q. Okay.

A. And you want to know how?

Q. Yes. I'm going back first to something else that you said. You said that Mr. Francesco berated you; is that correct?

A. Sure.

Q. How did he do that?

6

A. Work-wise, comments-wise, times that I'm—he always gave me my assignment first and had me out of the building first. While everybody else was reading the paper and drinking coffee and relaxing, you know, I was the first one to—he would come out of the office first and give me an assignment and have me out in my truck. We started working at 7:30, and everybody is drinking coffee and reading the paper, and at 7:32, I'm in the truck out on the street.

Q. Okay. Did Mr. Barber work with you at that time?

A. No.

Q. Were there any other African Americans that worked with you?

A. Well, Mr. Barber worked with me on a few occasions, but we were rarely paired.

Q. I'm sorry, my question was not clear.

A. Okay.

Q. When Mr. Francesco gave you assignments to have you out on the road at 7:32, were there African Americans at the headquarters that had not yet received their assignments?

A. Yes.

Q. Who were they?

. . .

A. Oh, Douglas Barber and Eric Stevens.

Q. So Mr. Francesco did not give assignments to Mr. Stevens or Mr. Barber that would have them out of the building first thing in the morning, correct?

A. Right.

Q. Okay. How did Mr. Francesco berate you?

A. Well, after he would give me my assignments and after everyone else got their assignments later on, he followed me to my job area and he watched me work on several occasions. He also gave some of the co-workers instructions

7

to watch me, my every move, what I did, where I went, what I did for lunch, what time I finished my job assignments, you know.

Q.  Okay.  At this time that Mr. Francesco watched you work, he was your supervisor, correct?

A.  Yes.

Q.  Did you know if he watched your colleagues do their work?

A.  No.

Q.  How do you know he was watching you and not your partner?

A.  Because I was watching him watch me.  If I'm working on the street, I would see him pull up at the corner of the street and sit there and watch me.

Q.  Did you ever talk to him during these times that he observed you?

A.  No, I was busy working.

Q.  Did he ever discipline you after he had observed you?

A.  Well, yes.

Q.  How?

A.  I was suspended for five days without pay. We got off of work at four o'clock in the afternoon, and there was a gentleman, Obi Harden, who was sitting in the office.  At 3:55, I was called in the office and I was told that I was suspended for five days and not to appear on the premises or I would be arrested.  And I asked him why was I being suspended, and he told me for suspicions that I was out of my work area during lunchtime.

Q.  Who told you this?

A.  Obi Harden.

Q.  Is he your supervisor?

A.  He was acting at that particular time.  Frank didn't do it.  Frank was gone. This was 3:55 in the afternoon.  This was five minutes before I get off of work.  I was suspended five days without pay on suspicion.  No hearing, no

verbal warning, no verbal confrontation, no questions, no anything. I was told that he was going on the suspicion of a comment that a co-worker made. That was the first of any type of disciplinary actions that was—that I received. I have never received a verbal warning, a hearing, nothing; just a five-day suspension without pay, and if you come on the premises, you'll be arrested.

Q. Okay. What's Mr. Harden's race?

A. Black.

(Lucas Dep. 58–8:62:3.)

Mr. Lucas went on to comment on Mr. Francesco's repeated "humiliation" of him in front of other co-workers and his lack of training as follows:

Q. In your complaint you say that Mr. Francesco corrected your work in front of other employees to embarrass and humiliate you?

A. Yes.

Q. How did he do that?

A. Well, he would walk to the back of my truck and he would just point out various issues of my truck that he didn't make me aware of what should be and what shouldn't be.

Q. Who did he point these different issues to?

A. Different co-workers.

Q. Which ones?

A. Angel Gonzales, Douglas Barber, Dennis Novack, Tony Calarogo. You know, whoever just happened to be in the area.

Q. Were you all there?

A. Sometimes I was, sometimes I wasn't.

Q. When you weren't there, how did you learn about this?

A.    I was told by other co-workers.

Q.    Which ones?

A.    Douglas Barber and Angel Gonzales, they told me that Frank and Harry was in your truck. They looked over your truck, and they commented on the condition of your truck or the condition of your camera, what sort of wheels you use, what type of pipe—you know, if you're going in a 12-inch pipe, you want to have a certain sort of wheels. You know, if you're going in a 36-inch or a 56-inch, you use a certain type of camera. You know, just a rechecking, re-evaluating, just over and over about, you know, questioning my techniques. Actually, I felt like they were learning from me, but they made it look like they were disciplining me about my techniques, because I had a few innovative techniques that they didn't know about that I used which was instilled into a lot of the daily work practices.

Q.    And why was this embarrassing and humiliating?

A.    Well, because it was used to demean me and my work ethic and how I went about doing my job, and I was very thorough about doing my job. I prided myself on doing my job, and I was made to look as though I was not thorough and I was careless, and, you know, not a good technician after ten years.

Q.    Did either Harry Adams or Frank Francesco discuss with you instances when they expected you to make repairs to your equipment.

A.    Yes, but I was never shown how.

Q.    Okay. What was the protocol for fixing equipment? Were you responsible for fixing your own equipment?

A.    We were supposed to be. My title entitled me to.

Q.    When you didn't know how to fix something and it was broken, what did you do with the equipment?

A.    Well, I went to them, and I asked them could they show me how to fix the cameras and how to fix the motor drives.

Q.    What were their responses?

A.    They put somebody else on it. They let somebody else fix it, and they gave me another camera and told me to go back into the field. But I said, but I

want to learn how to fix this camera and fix this motor drive, and I was never allowed to. I kept asking, and I was persistent in asking why, and Frank Francesco told me don't worry about it.

Q. He never gave you a reason?

A. Never gave me a reason.

Q. Did you ask Harry Adams why you weren't allowed to learn how to fix your equipment?

A. Yeah. At first he told me because I wasn't a technician. And then when I became a technician, he never gave me an answer. He told me don't concern myself with that. But I said, but everybody else knows how, they spend time in-house working on cameras and they get time out being shown on how to work on motor drives and cameras, but I was not allowed that, you know, training.

Q. Were there any of your co-workers who were also not permitted to repair their equipment?

A. None. Even people who I had seniority over. That's a term that hasn't been used. Seniority, remember that term? You know what that means?
. . .
Q. Were any of your co-workers prevented from attending training opportunities.

A. Not that I know of. I've had co-workers come in who were brand new, come in and learn things that I haven't learned that I was there for years.

(Id. at 99:17–103:19.)

Finally, Lucas complained that he was repeatedly given more hazardous assignments than his co-workers:

Q. Okay. Is it fair to say that you believe Mr. Novack or Mr. Francesco were giving you assignments that were beneath you?

A. Well, I wouldn't say the term beneath. The term—well, what I would feel would be more appropriate would be more hazardous.

Q. You felt your assignments were hazardous?

A.     Yes.  In some instances, yes.

Q.     How so?

A.     The area of the city that I worked in, the nature of the job, what had to be done, working in trenches, hanging off bridges, anything that the other fellow co-workers didn't want to do was passed on to me, unsafe situations.

Q.     Were these assignments within your job description?

A.     The job was in the job description, but we have the discretion of turning down a job that would be deemed unsafe.

Q.     Did you ever turn down a job that you were assigned because it was unsafe?

A.     A few times, yes, I did turn down a job that I felt was unsafe.

. . .

Q.     Who did you express that to?

A.     My supervisor [Mr. Francesco].

. . .

Q.     Okay.  And what happened when you expressed to Mr. Francesco that the jobs were unsafe?

A.     Well, he didn't let me do them.  I didn't do them.  He actually gave them to someone else?

. . .

Q.     Okay.  Were you disciplined for not doing those jobs?

A.     No, not written-wise.  There was comments made.

Q.     What kinds of comments?

A.     Well, you know, not being up to, you know, handle the position of doing the job.

(Id. 28:20– 30:7.)

Frank Francesco, however, offered a different version of all of these various allegations made by Plaintiff.  First, with respect to disciplining Mr. Lucas, Francesco testified as follows:

A.    We were given—we were all given a training class in—it's from a— it's a company called—well, I don't know if it's a company. It's an organization. It's a national organization called NASSCO, N-A-S-S-C-O, National Association of Sewer Service Companies. And what they were doing was nationalizing the standards by which defects were recorded in a sewer video. So we were all given this training in the summer of '03. He [Lucas] was given that training too. And after that training, the reports that we would start turning in would be critiqued. My supervisor Harry Adams would critique the reports. I would critique them as well. And he would usually get to them before me, and if he seen any problems, he would address, you know, bring them to my attention. And when, you know, he saw, like, a lot of the problems, he'd say talk to the guy about this or that and show them where they did wrong.

Q.    Was he the only—so you would critique it or correct his [Lucas's] reports; it that correct?

A.    Yes.

Q.    Would that happen on a regular basis or would that be intermittent or once in a while?

A.    It would be on a regular basis.

Q.    And I thought that you said most of the time you got along with him okay, but there were just some occasions when you had to correct him?

A.    Yeah, well, in the reporting and stuff like that. And, you know, when I had to point out certain things to him.

Q.    Were there other employees you had to point out—

A.    Sure. Absolutely. They all made mistakes in the beginning.

Q.    Did he get better with his mistakes?

A.    It took him very long, and he did show a light improvement. He was starting to get better.

Q.    And did that continue, or did that stop?

A.    It continued gradually, but then, you know—well, that's it, it continued gradually. So his reporting was starting to improve considerably. He was

getting up to snuff with everyone else.

(Francesco Dep. 21:3–22:21.)

As to training, Francesco testified as follows:

Q.    Now, during the time that you were group leader, did Mr. Lucas ever complain to you about not getting training opportunities?

A.    Yes, he did complain.

Q.    Okay.

A.    And he had even filed a grievance with DC 33.

Q.    And we're talking in approximately a 6 year period because I'm just focusing on the time that you were a group leader, not when you were a supervisor. Do you recall how many times that he complained about not getting training opportunities?

A.    That was the only time that I recall.

Q.    He told you this once?

A.    Yes.

Q.    And that's when he filed a grievance?

A.    Yes.

. . .

Q.    And after you became supervisor, did Mr. Lucas ever complaint to you about not getting training opportunities?

A.    There's none that I recall.

(Id. at 23:20–25:9.)  He went on to comment that there was never any training given in that department that was only singled out to certain individuals.   (Id. at 26:13–15.)  He also noted that Lucas never talked to him about learning how to repair anything and that nobody was ever taught how to repair anything—they just learned on the job.  (Id. at 31:23–32:19.)

Finally, with respect to unsafe job assignments, Mr. Francesco explained as follows:

A.   [T]here was one job I did give to Mr. Lucas, and he came back and told me that there's some unsafe issues here. So then I went out with Mr. Barber to investigate what the issues were and . . .

Q.   So Mr. Lucas did start a job and say that it's unsafe?

A.   Oh, yeah, he started a job—well, he didn't really start the job. He went out there, determined it was unsafe, came back to me, said this job is unsafe. He didn't specify what the issues were. So I said, okay, I'll go out with Doug and we'll check it out ourselves and we'll take a look, because Doug's my senior guy. So, we went out. I said Doug, I need you to, you know, let's look a this thing together and see what issues are unsafe here and see what we can do about it.

Q.   Did Mr. Lucas ever come to you any other times either before or after that incident and tell you that a job was unsafe?

A.   Not that I recall, but it could have happened because there are some traffic issues, some streets or some corners that have issues. So it could have happened.

Q.   And when you took Doug out with you, was that before or after Mr. Barber complained to you about—that he was getting jobs that other people were refusing?

A.   It was before.

. . .

Q.   And who ended up finishing that job [that Lucas said was dangerous]?

A.   Doug, myself, and I think we had some other technicians with us, and we wound up finishing it.

(Id. at 36:13–38:10.)

On November 13, 2009. Lucas filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging:

15

I am subjected to different treatment on the basis of my race in but not limited to these examples: I have never received formal training. On or about October 2009, Mark (last name unknown, Caucasian) was newly hired to the department. The Respondent provides Mark with training that I have not had to date. The Respondent purposely computes my leave time incorrectly. I am permitted less overtime hours than my Caucasian counterparts. I am constantly threatened to be written up. On or about October 2009, I was given an oral warning for going out of the district to have lunch. Caucasian employees are permitted to leave the district and take extended lunch breaks. I am publicly berated in front of the group by Harry Adams (Caucasian) supervisor and Frank Francisco (Caucasian) group leader. If supervisors have issues with Caucasian employees they are taken aside and spoken to respectfully. My work performance is as good or better than my Caucasian counterparts.

(Def.'s Mot. Summ. J., Ex. 12.) The City was served on December 1, 2009, with a copy of the complaint filed with the PHRC.

Thereafter, in July 2010, Obi Hardin, an African-American man, became group leader over Plaintiff. (Dep. of Obi Hardin ("Hardin Dep."), 7:1–3, Feb. 4, 2013.) Francesco told Hardin that he had some problems with Plaintiff's performance, including his reports, how he filled out his work orders, and where he took the truck when he was outside the shop. (Id. at 10:1–11.) Hardin was aware of "issues going on between Mr. Francesco and Mr. Lucas," (id. at 11:16–20), but did not witness Plaintiff being treated unfairly for any reason. (Id. at 14:8–10.)

On June 30, 2010, Plaintiff traveled more than five miles from his job site during lunch to visit the Union Hall across town and then falsified his mileage sheet. (Def.'s Mot. Summ. J. 14.) On July 1, 2010, Francesco requested a disciplinary hearing to discuss this incident and so Plaintiff could have his shop steward present. (Francesco Dep. 57:21–59:4.) Because the shop stewards refused his defense, however, that hearing never happened. (Id. at 59:5–11.) Francesco made a second request for a hearing on July 20, 2010, but due to the shop stewards' continued refusal to attend, that hearing was also canceled. (Id. at 57:21–23, 59;5–11.) Subsequently, on

August 12, 2010, Plaintiff was notified that he was being suspended without pay for five days. (Def.'s Mot. Summ. J., Ex. 14.)  The Notice of Suspension stated that, on June 30, 2010, Plaintiff traveled over five miles away from his job site around lunch time to visit the Union Hall, yet, on his vehicle mileage sheet, he falsely indicated that he returned to his afternoon assignment.  (Id.) Because this was the third time he had participated in falsification of work records in less than eighteen months, he was subject to disciplinary action.  (Id.)  During his suspension, he received a Performance Report, dated August 19, 2010, wherein he received "satisfactory" for the quality of his work, safety, and work relationships, but "unsatisfactory" in the areas of quantity of work, dependability, compliance with departmental attendance standards, initiative, and work habits. (Def.'s Mot. Summ. J., Ex. 17.)  The stated reasons for the rating were his traveling of far distances during lunch, repeated falsification of his vehicle mileage sheet, and use of all leave as soon as he earned it.  (Id.)

On September 8, 2010, Francesco held a meeting to discuss the special performance evaluation that he had given to Lucas.  (Hardin Dep. 16:15–17:15.)  Present at that meeting were Francesco, Lucas, Hardin, and the union steward.  (Id. at 17:16–19.)  At that meeting, Plaintiff got angry when the subject came up about maintaining his equipment.  (Def.'s Mot. Summ. J., Ex. 18.)  He said, "If I hear that I was given formal training, I am going to flip this table over." (Id.)  After Francesco told him that he was given the same training as everybody else, he got angry and said, "I'm getting ready to barf," and left the room.  (Id.)  On September 10, 2010, Francesco gave Plaintiff a written warning indicating that this type of behavior was not acceptable.  (Id.)

On September 14, 2010, while at work, Plaintiff suffered what he thought was a heart

attack or stroke.  (Lucas Dep. 86:16–17.)  He was taken by ambulance to the hospital where he spent the night for evaluation.  (Id. at 86:17–21.)  He was then released under his doctor's care and was out from work for twelve weeks under the Family and Medical Leave Act.  (Lucas Dep. 86:22–87:1; Def.'s Mot. Summ. J., Ex. 21.)  According to Plaintiff, he had previously asked Debra McCarty, Deputy Commissioner of Operations at the Philadelphia Water Department, for a transfer to Baxter Water Treatment Plant at that time and she did not grant his request.  (Lucas Dep. 85:3–12.)  Later, when he tried to return to work after his leave, he was told that Baxter Water Treatment Plant did not want him because of his record, evaluation, and suspension.  (Id. at 85:15–22.) Ms. McCarty stated that Plaintiff spoke to her at that time about being under stress due to some of the criticism he was receiving at work.  (Dep. of Debra McCarty ("McCarty Dep."), 14:19–15:24, 16:7–22, Feb. 8, 2013.)

Following his leave, Plaintiff did not request any accommodation from the Water Department.  (Id. at 103:20–104:7.)  Rather, on December 7, 2010, Lucas sent a note to the Water Department that stated, "I am choosing to opt for early retirement @ this time effective 12/7/10."  (Def.'s Mot. Summ. J., Ex. 22.)  Defendant honored his request and granted him early retirement as of that date.  (Id., Ex. 23.)

After his hospitalization, Plaintiff was seen by John Telegadis, M.D., who treated him for anxiety and started him on Lexapro.  (Id., Ex. 20.)  He then followed up with a psychiatrist and started on Xanax as needed for anxiety.  (Id.)  Plaintiff directly attributed his anxiety and panic attacks to his work conditions.  (Id.)  On December 15, 2010, Dr. Telegadis wrote a letter stating as follows:

Mr. Robert Lucas is under my medical treatment for anxiety and chest pains.  Date

of first treatment was 09/14/2010.  He has been released to return back to work full
duty on 12/06/2010, but should not be exposed to a stressful work environment.
Diagnosis: Anxiety, panic attacks, and non-cardiac chest pain
Prognosis: Fair

(Id., Ex. 24.)  On February 7, 2011, however, Dr. Telegadis stated in a report to the PHRC that

Plaintiff's disability was permanent.  (Id., Ex. 25.)  As of October 2012, Plaintiff was still being

treated with Xanax and Lexapro.  (Id.)  Dr. Telegadis opined that Plaintiff was unable to work

due to his anxiety and could not function in a stressful environment or else his anxiety would be

exacerbated and would develop worsening panic attacks.  (Id.)

On January 11, 2011, Plaintiff filed a complaint with the PHRC alleging retaliation and

discrimination based on a disability.  The EEOC issued a Right to Sue Letter on April 7, 2011

and the PHRC issued a Right to Sue Letter on January 17, 2012.  On July 7, 2011, Plaintiff

initiated the current federal litigation.  On February 13, 2012, this Court granted Defendant's

Motion to Dismiss without prejudice to allow Plaintiff's to file an Amended Complaint.  Plaintiff

availed himself of this opportunity and, on February 29, 2012, filed a First Amended Complaint

setting forth six causes of action.  Count I asserts a violation of the Civil Rights Act of 1964

("Civil Rights Act"), 42 U.S.C. § 2000e, et seq., due to race discrimination.  (Id. ¶¶ 25–29.)

Count II claims a violation of the Pennsylvania Human Relations Act ("PHRA"), 42 Pa.C.S. §

951, et seq.  (Id. ¶¶ 30–34.)  Count III contends that Defendant violated the Civil Rights Act by

retaliating against him.  (Id. ¶¶ 35–39.)  Count IV sets forth a corresponding retaliation claim

under the Pennsylvania Human Relations Act.  (Id.  ¶¶ 40–44.)  Count V claims disability

discrimination and failure to accommodate under the PHRA.  (Id. ¶¶ 45–48.)  Finally, Count VI

asserts a violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.

(Id. ¶¶ 49-52.)

On March 8, 2013, Defendant filed the present Motion for Summary Judgment and on April 8, 2013, Plaintiff filed a Response. The Motion is now ripe for judicial consideration.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III. DISCUSSION

### A. Discrimination Under Title VII and the PHRA

Counts I and II of the First Amended Complaint allege that the City of Philadelphia discriminated against Plaintiff under Title VII and the PHRA.[1] Specifically, he argues that (1) he was subjected to a hostile work environment because of his race; (2) that the hostile work

---

[1] Because the analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical, the Court will consider those two claims together. See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317, n.3 (3d Cir. 2000).

environment resulted in a constructive discharge; and (3) that he was subject to disparate treatment because of his race.  The Court considers each theory individually.

### 1. Hostile Work Environment

To establish a prima facie case of hostile work environment, a plaintiff must show that (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability.  See Verdin v. Weeks Marine, Inc., 124 F. App'x 92, 95 (3d Cir. 2005); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).  Factors which may indicate a hostile work environment include: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Sherrod v. Phila. Gas Works, 57 F. App'x 68, 75 (3d Cir. 2003) (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)).  To establish a hostile work environment, a plaintiff must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [the victim's] employment."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quotation omitted; alterations in original).   As such, a plaintiff cannot rely upon casual, isolated, or sporadic incidents to support his claim of hostile work environment harassment.  See Howard v. Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 692 (W.D. Pa. 2010).  While it is possible for a single action to constitute a claim for hostile work environment harassment if the act is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work," generally a plaintiff must show that she was

22

subjected to "repeated if not persistent acts of harassment." Bedford v. Se. Pa. Transp. Auth., 867 F. Supp. 288, 297 (E.D. Pa. 1994). Moreover, conduct that is merely offensive or which has the effect of making an employee's life at work unpleasant or uncomfortable is, without more, not actionable. Harris, 510 U.S. at 21–22. Additionally, mistreatment that is not motivated by the plaintiff's protected class, but rather by a bad working relationship or mistaken belief of insubordination does not create a hostile work environment. Gharzouzi v. Nw. Human Servs. of Penn., 225 F. Supp. 2d 514, 534 (E.D. Pa. 2002). Notably, however, "the advent of more sophisticated and subtle forms of discrimination requires that [the Court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment in evaluating a hostile work environment claim." Cardenas v. Massey, 269 F.3d 251, 261–62 (3d Cir. 2001).

Defendant now contends that Plaintiff has not met three of the elements of a prima facie case of a hostile work environment claim: (1) that he suffered intentional discrimination because of his membership in a protected class; (2) that the discrimination was pervasive and regular; and (3) that the discrimination would detrimentally affect a reasonable person of the same protected class in that position.[2]

a. **Intentional Discrimination**

Title VII protects only against harassment based on discrimination against a protected class; it is not "a general civility code for the American workplace." Oncale v. Sundowner Offshore Serves., Inc., 523 U.S. 75, 80 (1998). Thus, under the first element of a hostile work

---

[2] Defendant concedes that the alleged discrimination was subjectively perceived by Plaintiff to be hostile and that Plaintiff established respondeat superior liability. Accordingly, the Court need not discuss these elements.

environment claim, a plaintiff must show that a defendant's conduct "was motivated by animus based on . . . race." Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 544–45 (W.D. Pa. 2009). The United States Court of Appeals for the Third Circuit has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Abramson v. William Paterson Coll. of NJ, 260 F.3d 265, 278 (3d Cir. 2001). Indeed, the first prong was not "designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions." Id. As such, "it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind." Mufti, 667 F. Supp. 2d at 545. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Abramson, 260 F.3d at 277. Stated differently, "the intent to discriminate can be inferred from the entire context and the conduct of the actors involved." Mufti, 667 F. Supp. 2d at 545.

Taking the facts in the light most favorable to Plaintiff, this Court finds that a genuine issue of fact exists as to whether Lucas suffered intentional discrimination because of his race. Both parties agree that, as an African-American, Plaintiff is a member of a protected class. Defendant also accurately notes that although Frank Francesco supervised fourteen employees, eight of whom were African-American, Plaintiff is unable to prove that other African-Americans in his unit were subject to the same treatment such as being checked on regularly in the field and receiving the first assignments of the day. Defendant's argument, however, disregards Plaintiff's lengthy testimony regarding Francesco's repeated comments about (a) Plaintiff's support of Barack Obama because he was black and (b) Plaintiff becoming the "surrogate" for Francesco's

hostility towards Obama because he shared Obama's race and politics. Finally, Plaintiff testified that Francesco had a derogatory image of Obama on his computer with a bucket of fried chicken and drinking Kool Aid—stereotypes for African-Americans.[3]

To be clear, such evidence is weak at best and certainly would not support a summary judgment ruling in Plaintiff's favor. That is not, however, the standard with which the Court is presently faced. Rather, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Abramson, 260 F.3d at 277. When presented with live testimony, a jury could reasonably determine that Francesco did, in fact, harbor some racial animus and treated Plaintiff poorly due to his race. See Owens v. Allegheny Valley Sch., 869 F. Supp. 2d 653, 662 (W.D. Pa. 2012) (holding that supervisor's reference to plaintiff, an African-American, as "Buckwheat," accompanied by the supervisor's requiring the plaintiff to perform demeaning tasks from which white colleagues were exempt, making disparaging remarks about plaintiff to other employees, requiring him to work later when white colleagues were permitted to go home, and berating him was sufficient to show discriminatory animus). Accordingly, the Court finds that Plaintiff has created a genuine issue of material fact as to the first element of a hostile work environment claim.

### b. Pervasive and Regular Discrimination

The second element of a hostile work environment claim requires that the discrimination

_____

[3] In many stereotypes of African-Americans, they are portrayed as "having a love of fried chicken, watermelon, corn bread, Kool-Aid, waffles and grape drink." (http://en.wikipedia.org/wiki/Stereotypes_of_African_Americans_in_the_United_States, *last visited*, May 15, 2013.)

be "severe or pervasive." Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268. 270 (2001). As noted above, the United States Supreme Court has observed that "hostile work environment" harassment must be pervasive or severe enough "to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank., 477 U.S. at 67 (quotation omitted; alteration in original). The test looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance. McGraw v. Wyeth-Ayerst Labs., Inc., No. Civ.A.96-5680, 1997 WL 799437, at *5 (E.D. Pa. Dec. 30, 1997). This "[c]onduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not support a hostile work environment claim. Id. Notably, to determine whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone" or to individual instances of harassment, but rather must "view the record as a whole picture" because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance." Abramson, 260 F.3d at 276 (quoting Andrews v. City of Phila, 895 F.2d 1469, 1484 (3d Cir. 1990)).

In Owens v. Allegheny Valley Sch., 869 F. Supp. 2d 653 (W.D. Pa. 2012), a case analogous to the one currently before us, the court considered, under a motion to dismiss standard, whether the plaintiff had stated a claim for hostile work environment. The plaintiff in that matter was an African-American employed as a driver with the Allegheny Valley School. Id.

26

at 656. According to the complaint, the plaintiff's supervisor treated him unfairly compared to white drivers including yelling at him, compelling him to perform demeaning jobs, calling him "Buckwheat," requiring him to work while white drivers relaxed, making him stay late after his shift ended, making disparaging remarks about the plaintiff's use of sick time, and attempting to frame him for employee theft by using his pin number to make personal purchases. Id. Ultimately, the plaintiff went out on FMLA leave due to stress and anxiety from work and thereafter resigned claiming constructive discharge. Id. at 656–57. Taking all of the plaintiff's allegations as true, the court held that, "[c]onsidering the frequency of the discriminatory conduct (ongoing), its severity (the 'Buckwheat remark and the questionable pin number incident'), its humiliating nature (forced to perform demeaning tasks), and its interference with his work performance (renewed feelings of anxiety and stress when his FMLA leave was expiring), the totality of the circumstances demonstrate that Owens's hostile work environment claim is actionable." Id. at 661.

As in Owens, Plaintiff's claim of severe or pervasive discrimination in this case takes multiple forms, including claims that: (1) Francesco made multiple belittling comments to him at work; (2) Francesco regularly gave him the first assignment of the morning and had him out of the building first; (3) Francesco either personally or through others checked up on Plaintiff while he was out on assignment despite Plaintiff having good reviews; (4) Francesco would single out Plaintiff and criticize his techniques and his truck condition in front of other employees; (5) Plaintiff was repeatedly assigned hazardous jobs and, if he complained about them, Francesco would have another African American complete them, and (6) Plaintiff was repeatedly denied training opportunities provided to white employees. Defendant argues that such events were

either nothing more than occasional incidents or not sufficiently severe as to satisfy the requisite standards. In doing so, however, Defendant analyzes each alleged form of harassment in isolation. For example, with respect to Plaintiff's alleged dangerous assignments, Defendant argues that Plaintiff had the discretion to reject jobs he believed unsafe, that he actually turned down jobs he thought were unsafe and never disciplined, and that some of the jobs he failed to complete were finished by white employees. As to the early morning assignments, Defendant argues that such morning assignments did not affect the terms of his employment and that whoever he was partnered with each day had the same early assignment. With respect to Francesco's visits to Plaintiff's worksite, Defendant asserts that one of Francesco's responsibilities was to check on his employees and that these visits did not interfere with Plaintiff's ability to do his job. Finally, Defendant contends that Francesco's correction of Plaintiff's work in front of co-workers or comments on the condition of his truck or equipment were not so severe or pervasive as to affect the conditions of his employment.[4]

On its face, Defendant's assessment of Plaintiff's claims suggests that these events were nothing more than "ordinary tribulations of the workplace" unmotivated by any racial animus. For the Court to make such a determination on summary judgment review, however, would require a complete disregard of two key legal principles. First and foremost, the Court would have to partially credit Francesco's testimony over Plaintiff's. Under Federal Rule of Civil Procedure 56, however, the Court must avoid credibility determinations and take the facts, and all reasonable inferences from them in the light most favorable to Plaintiff. In a hostile work

---

[4] Defendant also discusses an encounter that Plaintiff had with a fellow Water Department employee unrelated to work. Plaintiff, however, does not appear to rely on this as part of his hostile work environment claim.

environment case, "[a] [p]laintiff's deposition testimony is sufficient to show the existence of a material factual issue for trial." Wallace v. United Parcel Serv., No. Civ.A.02-1685, 2006 WL 1806404, at *6 (D.N.J. June 29, 2006), aff'd, ___ F. App'x ___, 2007 WL 2988582 (3d Cir. 2007). Indeed, it is recognized that "[t]he 'severity and pervasive' evaluation of a hostile work environment claim is particularly unsuited for summary judgment, because whether the harassment or discrimination is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" Syed v. YWCA of Hanover, __ F. Supp. 2d __, 2012 WL 3990834, at *7 (M.D. Pa. 2012) (quoting Rorrer v. Cleveland Steel Container, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010)).

Second, in order to find that the complained-of conduct was not severe or pervasive under Defendant's analysis, the Court would have to separately dissect each individual event. The Third Circuit, however, has made clear that "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Abramson, 260 F.3d at 276. As in Owens, over a two and a half year period, Plaintiff was repeatedly subject to at least six different types of harassing and demeaning behavior, coupled with a seemingly discriminatory animus, that ultimately caused him great anxiety. Although none of the events taken in isolation could be deemed "severe" or "pervasive," these same events viewed in conjunction could be deemed to regularly create a threatening and humiliating employment environment. Based on the evidence currently of record, it is not for the Court on summary judgment to make credibility assessments and usurp the role of a reasonable factfinder.

### c.     Detrimentally Affecting a Reasonable Person of the Same Protected Class in that Position

In a third effort to undermine Plaintiff's hostile work environment claim, Defendant contends that no reasonable jury could find that a similarly situated person of the same race would have been detrimentally affected by the alleged incidents of discrimination. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Harris, 510 U.S. at 21 "In determining whether the fourth prong, the objective test, is met, we must 'look[ ] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Abramson, 260 F.3d at 280 (quoting Harris, 510 U.S. at 23). "The objective standard protects the employer from the 'hypersensitive' employee, but still serves the goal of equal opportunity by removing the walls of discrimination that deprive a protected group member of self-respecting employment." Syed, 2012 WL 3990834, at * 9.

The Court struggles most with this element of Plaintiff's case. Defendant argues that while Plaintiff "may have subjectively perceived the actions of his supervisor as hostile, a reasonable person would not find that they were based on his race or that they rose to a level of a hostile work environment. The incidents that Lucas labels as discriminatory are merely instances in which Francesco performed his supervisor duties and Lucas unreasonably took offense." (Def.'s Mem. Supp. Mot. Summ. J. 12.) Although Defendant's argument could have some truth, the Court finds that it again rests on an improper application of the summary judgment standard.

While Defendant labels Francesco's actions towards Plaintiff as mere "perform[ance] [of] his supervisory duties," a reasonable juror could, given the full context of these actions, interpret them as efforts to harass Plaintiff. For example, when Francesco characterizes his critiques of Plaintiff as simply acting in his supervisory capacity, Plaintiff describes these critiques as a public berating in front of Plaintiff's co-workers. Further, although Francesco stated that any observation of Plaintiff at his job site was rare and part of his duties, Plaintiff described this conduct as regular and pervasive with no reason. Crediting Francesco's version, the Court would be inclined to agree that Plaintiff's interpretation of the conduct at issue was nothing more than the reaction of a hyper-sensitive employee. Crediting Plaintiff's version, however, a reasonable juror could find that a similarly situated person of Plaintiff's race would have been detrimentally affected by Francesco's actions, particularly given that such actions came in the wake of some allegedly racist comments to Plaintiff. As such, the Court finds that Plaintiff has satisfactorily established a genuine issue of material fact on this element as well.

### d. Conclusion on Hostile Work Environment Claim

In sum, the Court declines to grant summary judgment on Plaintiff's hostile work environment claim. The allegations at issue are highly fact-intensive, requiring a jury to listen to live testimony and evaluate the witnesses' credibility. Genuine issues of material fact remain as to precisely what occurred at the Philadelphia Water Department with respect to management's treatment of Plaintiff. While Plaintiff's claim may ultimately prove to have no merit, this issue remains a determination for a factfinder and not a legal conclusion for the Court.

## 2. Constructive Discharge Claim

In conjunction with his hostile work environment claim,[5] Plaintiff also alleges that the

harassment he suffered was so severe as to constitute a constructive discharge.  In Pennsylvania

State Police v. Suders, 542 U.S. 129 (2004), the United States Supreme court aptly explained the

nature of a hostile work environment claim implicating a constructive discharge:

> The constructive discharge here at issue stems from, and can be regarded as an
> aggravated case of, sexual harassment or hostile work environment.  For an
> atmosphere of . . . harassment or hostility to be actionable, we reiterate . . . the
> offending behavior "must be sufficiently severe or pervasive to alter the conditions
> of the victim's employment and create an abusive working environment." . . . A
> hostile-environment constructive discharge claim entails something more: A plaintiff
> who advances such a compound claim must show working conditions so intolerable
> that a reasonable person would have felt compelled to resign.

Suders, 542 U.S. at 146–47 (internal citation omitted).  "[C]onstructive discharge is the adverse

employment action that is most common with claims of hostile work environment."  Ilori v.

Carnegie Mellon Univ., 742 F. Supp. 2d 734, 738 n.1 (W.D. Pa. 2010) (quoting 6 Modern

Federal Jury Instructions—Civil, ¶¶ 6.1.1–7 (Matthew Bender) (2010)).

To establish a claim for constructive discharge, a plaintiff must show a greater severity or

pervasiveness of harassment than minimum required to prove a hostile work environment.

Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006).  This is purely an

objective inquiry.  Suder, 542 U.S. at 141.  "Mere dissatisfaction with work assignments, a

---

[5] The parties analyze constructive discharge as if it were an entirely separate cause of
action.  The parties, however, have not cited and the Court has not found any case suggesting that
"constructive discharge" is a distinct cause of action under either statute.  The Supreme Court has
recognized, however, that under Title VII an employee may bring a "hostile-environment
constructive discharge claim."  Pa. State Police v. Suders, 542 U.S. 129, 146 (2004). This is "an
aggravated case" of a hostile work environment claim in which the plaintiff must prove that her
working conditions have become "so intolerable that a reasonable person would have felt
compelled to resign."  Id.

feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 374 (4th Cir. 2004) (internal quotations omitted). Under this objective test, the Third Circuit has identified certain factors indicative of constructive discharge: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) demotion or reduction in pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169–70 (3d Cir. 2013).

Applying this standard to the present case creates somewhat of a conundrum for this Court. On one hand, Plaintiff has produced enough evidence to create a genuine issue of material fact as to his hostile work environment claim. Because the jury will have to consider whether the alleged actions by Defendant are "sufficiently severe or pervasive to alter the conditions of employment," the simple route would be to allow it to further consider whether the environment became so intolerable that a reasonable person would be compelled to resign, thereby establishing constructive discharge. On the other hand, however, it is abundantly clear that constructive discharge requires "something more" than a mere hostile work environment. As such, merely surviving summary judgment on the hostile work environment claim does not compel the conclusion that the constructive discharge claim must likewise survive. Indeed, courts have found that a plaintiff could survive summary judgment on a hostile work environment claim, but not create a genuine issue of material fact on a related constructive discharge claim. See Lerew v. AT & T Mobility LLC, No. Civ.A.07-1456, 2009 WL 1080638, at *2–3 (M.D. Pa. Apr. 22, 2009) (granting defendant summary judgment on constructive

discharge claim, but not the hostile work environment claim); Konstantopoulos v. Westvaco Corp., 893 F. Supp. 1263 (D. Del. 1994) (granting judgment in favor of plaintiff on hostile work environment claim, but not constructive discharge claim); see also Young v. Temple Univ. Hosp., 359 F. App'x 304, 309 n.5 (3d Cir. 2009) ("Even assuming [plaintiff] had established a basis for employer liability [to support a hostile work environment claim], we would still affirm the District Court's grant of summary judgment on her constructive discharge claim because [Defendant] did not 'knowingly permit[ ] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'").

Plaintiff, in this matter, has presented no evidence that he was threatened with discharge, encouraged to resign, demoted, given a reduction in pay or benefits, involuntarily transferred to a less desirable position, or faced an alteration in job responsibilities. Although Plaintiff received one unsatisfactory job evaluation and one suspension, those actions, as explained later in this Memorandum, were taken in response to Plaintiff's undisputed violation of work procedure. In addition, while Plaintiff made one request for a transfer—prior to ever being hospitalized— he has not shown that, while out on FMLA leave, he ever attempted to seek out some type of reasonable accommodation that would allow him to avoid returning to the alleged hostile work environment. See Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993) (explaining that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option"). Finally, Plaintiff already had a pending complaint with the PHRC to address his claims of hostile work environment. Simply put, none of the indicators of constructive discharge, as set forth by the Supreme Court and Third Circuit, are present in this case. In turn, no jury could find that working conditions

became so intolerable that a reasonable person in Plaintiff's position would be compelled to resign. Given the absence of any genuine issue of material fact on this claim, the Court is compelled to grant this portion of Defendant's Motion for Summary Judgment.

### 3. Disparate Treatment

Defendant next seeks summary judgment on Plaintiff's disparate impact theory. Title VII of the Civil Rights Act of 1964 provides in relevant part that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a claim of discrimination based on disparate treatment, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire. Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court set forth the precise framework for analyzing a claim based upon racial discrimination where, as here, there is no direct evidence of discrimination. First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Next, if the plaintiff establishes a prima facie case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. Id. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981). The

inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. Id.

Finally, if the employer meets its burden of production, the presumption of discrimination created by plaintiff's prima facie case "drops out of the picture." Id. at 511 (citing McDonnell Douglas). In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.")). "Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." Mitchell, 884 F. Supp. 2d at 371 (citing Reeves v.

36

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147–48 (2000)).

In the case at bar, Plaintiff has no direct evidence of discrimination.  As such, the Court must apply the McDonnell-Douglas burden-shifting analysis.

### a.  Prima Facie Case

A plaintiff must first establish a prima facie case of race discrimination by showing that (1) he was a member of a protected class; (2) he was qualified for his position; (3) he had an adverse action taken against him; and (4) similarly situated individuals who were not members of the plaintiff's protected class were treated more favorably.  McDonnell Douglas, 411 U.S. at 802; see also Kimble v. Morgan Props., 241 F. App'x 895, 897–98 (3d Cir. 2007).  Because the prima facie inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value,* not whether they fit into a mechanical formula."  Cobetto v. Wyeth Pharms., 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007) (emphasis in original),

In this case, the first three elements of the prima facie case do not appear to be in dispute.  First, Defendant concedes that Plaintiff belonged to a protected class, in that he is an African American.  Second, it admits that, at least until September 14, 2010 when he took FMLA leave, Plaintiff was qualified for his position.  Third, as to the adverse employment action, it is well-established that "[a]n adverse employment action sufficient to support a prima facie case must be 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits.'"  Sherrod v. Philadelphia Gas Works, 209 F. Supp. 2d 443, 450 (E.D. Pa. 2002) (quoting Burlington Indus., Inc. v. Ellerth,

524 U.S. 742, 761 (1998)), aff'd, 57 F. App'x 68 (3d Cir. 2003).[6]  Plaintiff appears to allege he

suffered adverse employment actions through his lack of training opportunities, poor performance

evaluation, and five-day suspension.  Under the foregoing standards, these actions satisfy the third

element of the prima facie case.[7]

With respect to the last element of the prima facie case, Plaintiff's claim stands on tenuous

ground.  As noted above, Plaintiff must establish that similarly situated individuals who were not

members of the plaintiff's protected class were treated more favorably.[8]  Plaintiff's sole argument

---

[6]  "Such an action 'in most cases inflicts direct economic harm and requires an official act taken by a supervisor within the company who has the power to make economic decisions affecting employees under his or her control.'"  Id. (citing Burlington, 524 U.S. at 762).  The action must be an actual adverse action, "as opposed to conduct that the employee generally finds objectionable."  Harley v. McCoach, 928 F. Supp. 533, 541 (E.D. Pa. 1996); see also Geisel v. Primary Health Network, No. Civ.A.07-1548, 2010 WL 3719094, at *7 (W.D. Pa. Sept. 17, 2010) ("[D]iscriminatory conduct other than discharge or refusal to hire is prohibited if it alters an employee's 'compensation, terms, conditions or privileges of employment,' deprives the employee of 'employment opportunities' or 'adversely affects [the employee's] status as an employee.'") (quotation omitted).

[7]  Neither Plaintiff's Complaint nor Plaintiff's Response in Opposition to the Motion for Summary Judgment clearly addresses the appropriate test for a disparate treatment employment discrimination claim.  Rather, Plaintiff's analysis focuses almost entirely on the hostile work environment standard with no discussion of the McDonnell Douglas burden-shifting framework.  Accordingly, the Court is left to speculate, based on inferences made in his Response Brief, as to Plaintiff's basis for his disparate treatment claim.  The sole adverse employment actions on which Plaintiff appears to rely for this claim are the lack of training opportunities, poor Performance Report, and five day suspension.  Thus, the Court focuses on these allegations.

[8]  In his Response to the Motion, Plaintiff argues that "evidence that other 'similarly-situated' employees outside the protected class is not required for a plaintiff to set forth his prima facie case. . . . All that the plaintiff need do at this point is show that adverse employment actions occurred under circumstances that give rise to an inference of unlawful discrimination.'" (Pl.'s Resp. Opp'n Mot. Summ. J. 11.)  Plaintiff's argument  appears to misunderstand the Third Circuit's ruling in Matczack v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997).  "Matczak reinforces the simple notion that we do not 'woodenly' demand proof of disparate treatment for a prima facie case, but instead may look to 'alternative' evidence—such as a replacement's gender and race—in our search for a causal nexus."  Dellaenna v.

regarding his discipline is that "it was common practice for workers to go beyond their assigned areas for lunch and breaks." (Pl's Resp. Opp'n Mot. Summ. J. 20.) The only evidence of record, however, reveals the opposite—Francesco testified that he looked at the other employees' mileage records and "didn't see any record of [employees abusing their lunch privileges] or reason to believe that others were doing it." (Francesco Dep. 50:2–11.) Further, Plaintiff identifies no evidence of any Caucasian employee that was not disciplined for the same conduct. Indeed, Defendant offered testimony that a Caucasian employee, Dennis Novack, was verbally warned for one similar violation. (Francesco Dep. 43:17–44:3.)

With respect to the claims of lack of training, Plaintiff offers only speculative testimony that he believed that he was not allowed to attend certain training sessions given to his other co-workers. He does not, however, suggest that only Caucasian co-workers were allowed to receive this training. (Id. at 93:17–97:4.) Nor can he identify a single training session from which he was excluded. Given the dearth of evidence on this point, the Court declines to find that Plaintiff has established his prima facie case of disparate treatment.

### b.     Legitimate Non-Discriminatory Reason and Pretext

Nonetheless, even assuming *arguendo*, that Plaintiff could establish a prima facie case, his claim of disparate treatment founders at the second and third steps of the McDonnell Douglas analysis. As noted above, once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse employment actions. All the employer need do at this juncture is introduce admissible

Tredyffrin/Easttown Sch. Dist., 449 F. App'x 209, 214 n.3 (3d Cir. 2011). Where no evidence presented raises an inference of a causal nexus between race and the adverse employment action, the fourth element of the prima facie case has not been satisfied. Id.

evidence that, if taken as true, would "permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons." Mitchell, 884 F. Supp. 2d at 370.

Defendant, in this case, has done so. First, with respect to the alleged denial of training opportunities to Plaintiff in the 2009 to 2010 time period, Mr. Francesco testified:

> Q. Now, in the water department in your unit, are there training opportunities for the employees that work for you?
>
> A. There are different training opportunities that come up from time to time that the City may offer. They do have a training program that they—you know, they'll send information out saying we're offering a course in—like just recently, I took a course in Microsoft Excel.
>
> Q. Okay.
>
> A. So, you know, a few of the, I guess, supervisors, group leaders, managers, some employees took that course. So from time to time, the City will offer special courses in different things that are job related like that.
>
> Q. Okay. And how does that work when it comes to training opportunities? Is that something that's posted? Is it on a first come, first serve basis, or is everybody required to go; how does that work?
>
> A. In our unit, the superintendent will make the determination if the course should be taken. He made the determination that I and a couple of people in our unit should take the Excel course. So usually the superintendent makes that decision.
>
> Q. And when Mr. Lucas was there in, let's say, 2009, 2010, who was the superintendent at the time?
>
> A. George Collier.
>
> Q. Is Mr. Collier African American?
>
> A. No.
>
> Q. He's white?
>
> A. Yes.
>
> Q. And was he, at that time, the person who would also make the decision about who should go for training?
>
> A. He would decide who should be given training.
>
> Q. In 2009, 2010, if you can recall, do you recall what any of the training opportunities were that he decided people should go to?
>
> A. I don't recall which training—***there was nobody in our unit that went to any kind of training in 2009 or 2010.***

(Francesco Dep. 15:9–17:4 (emphasis added).) Mr. Francesco went on to explain that Plaintiff, along with all others in his unit, were given training for the NASSCO sewer coding in 2003, but

"[t]here was no training ever given in our department that was only singled out to certain individuals" and there was never any training on trucks unless an employee was given a new truck with new equipment that would be demonstrated by the vendor. (Id. at 25:10–27:5; see also id. at 115:20–22.)

Second, with respect to his five-day suspension and his poor performance review, the basis for both is well-explained and well-documented by Defendant. The lunch policy for employees in Plaintiff's unit was that they had to remain within five minutes or five miles of their work area. (Francesco Dep. 109:23–110:12.) Ye, Plaintiff repeatedly violated this policy. First, in January 2008, Francesco had to speak with Plaintiff about traveling outside of his work area using a city vehicle. (Def.'s Mot. Summ. J., Ex. 8.) Subsequently, on March 16, 2009, Francesco again had to speak with Plaintiff about traveling away from his work district to take care of personal business. (Def.'s Mot. Summ. J., Ex. 10.) He was told that the next time that happened, he would be given a verbal warning. (Id.) Yet again, on October 23, 2009, Francesco spoke to Plaintiff about traveling away from his work district to take care of personal business and issued him a verbal warning. (Id., Ex. 11.) Although Plaintiff tried to explain away his actions, he never denied them. Finally, on June 30, 2010, Plaintiff again traveled more than five miles from his job site during lunch to visit the Union Hall across town and then falsified his mileage sheet. (Def.'s Mot. Summ. J., Ex. 14.) Although Francesco attempted to set up a disciplinary hearing to discuss this incident, Plaintiff's shop steward would not make himself available. (Francesco Dep. 57:21–59:11.) Accordingly, on August 12, 2010, Plaintiff was notified that he was being suspended without pay for five days. (Def.'s Mot. Summ. J., Ex. 14.) The Notice of Suspension stated that, on June 30, 2010, Plaintiff traveled over five miles away from his job site around

lunch time to visit the Union Hall, yet, on his vehicle mileage sheet, he falsely indicated that he returned to his afternoon assignment. (Id.) Because this was the third time he had participated in falsification of work records in less than eighteen months, he was subject to disciplinary action. (Id.) The challenged Performance Report, dated August 19, 2010, was issued during this suspension period. Along with some "satisfactory" ratings, Plaintiff received ratings of "unsatisfactory" in the areas of quantity of work, dependability, compliance with departmental attendance standards, initiative, and work habits. (Def.'s Mot. Summ. J., Ex. 17.) The stated reasons for the rating were his traveling of far distances during lunch, repeated falsification of his vehicle mileage sheet, and use of all leave as soon as he earned it. (Id.) Such reasons are sufficient for Defendant to meet its burden of showing a legitimate non-discriminatory reason for the adverse employment action.

As Defendant has met its burden of production in this case, the presumption of discrimination now "drops out of the picture" and the burden shifts back to Plaintiff to establish a genuine issue of material fact that Defendant's proffered reasons are merely pretextual. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact *both* that the reason was false *and* that a discriminatory animus was the real reason for the adverse employment action at issue. Fuentes, 32 F.3d at 763. It is at this juncture that Plaintiff's disparate treatment case fails. As to the alleged denial of training, Defendant produced undisputed evidence that there were no training sessions from which Plaintiff was excluded. In response, Plaintiff fails to specifically *any* such specific training session that his co-workers were allowed to attend but he was not. Indeed, his response to Defendant's Motion for Summary Judgment does not even mention Plaintiff's legitimate non-

discriminatory reason for his lack of training opportunities, let alone attempt to establish that it is pretextual for intentional discrimination.

The same holds true for Plaintiff's suspension and unsatisfactory Performance Report. From January 2008 to June 2010, Plaintiff violated the clearly-established rule on travel outside the work area during work hours on four separate occasions. On each occasion, he was spoken to by his supervisor and he never denied his actions. It was not until the fourth occasion that Plaintiff received discipline beyond a mere written or verbal warning. After the suspension began, Plaintiff was given a Performance Report consistent with the reasons for his suspension. Aside from speculating that such actions by Defendant were discriminatory, Plaintiff offers no denial of or explanation for the actions leading up to his discipline, no suggestion that any other employee committing the same type and number of infractions was not similarly disciplined, and no statement that Defendant's use of these infractions to suspend him was somehow false or pretextual. As noted above, "[l]iability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell, 884 F. Supp. 2d at 370–71. As Plaintiff has offered no alternative story for a jury to believe, the Court finds that Plaintiff has not satisfactorily proven disparate treatment based on race. Accordingly, the Court grants Defendant's Motion for Summary Judgment on this claim.

### B. Retaliation Claim

Plaintiff also seeks relief under a retaliation theory pursuant to Title VII. Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered

employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder. 42 U.S.C. § 2000e–3(a). "To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). As to the "protected activity" element, "the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Id. (citing Slagle v. Cnty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)). In either case, the employee must hold "an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. Id.

Pursuant to the second element, the Supreme Court has clarified what constitutes an adverse employment action. Originally, "the adverse employment action" for a retaliation claim required the same showing as for a disparate treatment claim. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006). In Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), however, the Supreme Court found "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 64. Rather, it held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well

might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 54 (quotation omitted). Nonetheless, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 68.

The third element of a prima facie case requires a showing of a causal connection between the Plaintiff's protected activity and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Moore, 461 F.3d at 341–42 (3d Cir. 2006). To determine whether a plaintiff has met the causation element, the court must consider all evidence that is "potentially probative of causation." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). Temporal proximity between the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)). "Rather, in cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third Circuit has demanded further evidence to substantiate a causal connection." McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008). "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint." Id.

Once a plaintiff establishes a prima facie case of retaliation, the claim is analyzed in accordance with the McDonnell Douglas burden shifting framework. Krouse, 126 F.3d at 500-01. If the plaintiff establishes the prima facie case, "the burden of proof shifts to the defendant to

proffer a legitimate nondiscriminatory reason. If the defendant satisfies that relatively light burden, the burden shifts to the plaintiff to show that reason was just a pretext for discrimination." Prise v. Alderwoods Grp., Inc., 657 F. Supp. 2d 564, 605 (W.D. Pa. 2009).

Plaintiff in this case asserts that his suspension and poor Performance Report were the result of retaliation for the filing of his November 13, 2009 claim with the PHRC. He asserts that "[i]t occurred outside of the normal procedure in that he did not receive a hearing in advance, and when a hearing was finally held after the fact he was disciplined again for speaking out at this hearing." (Pl.'s Resp. Opp'n Mot. Summ. J. 17.) He goes on to contend that "there is sufficient evidence of the irregularity of the suspension and the intervening animus, as well as the fact that this unsatisfactory review came after ten years of satisfactory evaluations, for a fact finder to find evidence of retaliation." (Id.)

Defendant, on the other hand, argues that Plaintiff's prima facie case fails because he cannot establish causation. More specifically, it contends that although Plaintiff filed his charge of discrimination in November 2009, it was not until July 1, 2010, seven months later, when Francesco indicated to Lucas and his Union representatives that he intended to take disciplinary action against Lucas for traveling beyond his work area and falsifying his timesheet on June 30, 2010. (Def.'s Mem. Supp. Mot. Summ. J. 20.) Moreover, the unsatisfactory Performance Report was served in August 2010, eight months after Plaintiff filed his PHRC complaint. (Id.) As such, according to Defendant, Plaintiff cannot show a causal connection between the filing of his complaint and the alleged retaliatory action.

The Court, however, need not engage in this causation analysis. Arguably, Plaintiff could establish causation through evidence that after he filed his PHRC complaint, he was met with a

continued "pattern of antagonism" from Francesco leading up to the suspension.  Nonetheless,

even assuming Plaintiff could establish his prima facie case, his claim fails at the second and third

steps of the McDonnell Douglas burden-shifting test.  As noted in detail above, Defendant has

offered a legitimate, non-retaliatory reason for both the suspension and the unsatisfactory

Performance Report.  Moreover, Defendant adequately explained the lack of a hearing preceding

the suspension by noting that the shop stewards repeatedly refused to attend and defend Plaintiff.

(Francesco Dep. 58:14–59:3; McCarty Dep. 19:1–11.)  Plaintiff, in turn, has offered no rebuttal or

showing of pretext.  Given this failure, his retaliation claim, set forth in Counts III and IV of his

Amended Complaint, must be dismissed.

### C.     Americans With Disabilities Act Discrimination Claim[9]

Plaintiff's final claim alleges discrimination under the Americans With Disabilities Act

("ADA").  Title I of the ADA prohibits covered employers from discriminating against qualified

individuals with disabilities because of their disabilities, a prohibition that includes failing to

reasonably accommodate such individuals.  See 42 U.S.C. § 12112(a), (b)(5).  "In contrast to Title

VII, it does not prohibit discrimination against *any individual* on the basis of disability, but, as a

general rule, only protects from discrimination those disabled individuals who are able to perform,

with or without reasonable accommodation, the essential functions of the job they hold or desire."

Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 191 (3d Cir. 2009).  To state a failure to

accommodate claim under the ADA, a plaintiff must allege: "'(1) he is a disabled person within

the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the

---

[9]  The same legal standard is used to analyze claims under the ADA and PHRA.  Kelly v.
Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Therefore, the Court's ensuing discussion of
Plaintiff's ADA claims also applies to her PHRA claims.

job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'" Id. at 186–87 (quoting Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004)).

At issue in the present case is the third element—"failure to accommodate." This element can be satisfied by a showing either that the employer (1) refused to provide a proposed reasonable accommodation, or (2) failed to engage in an interactive process after a request for accommodation was made, though a reasonable accommodation was possible. Solomon v. School Dist. of Phila., 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012). However, "[a]n employer's duty to provide a reasonable accommodation is not triggered until the employee puts the employer on notice that an accommodation is necessary." Conneen v. MBNA Am. Bank, N.A., 182 F. Supp. 2d 370, 378–79 (D. Del. 2002) (citing Jovanovic v. In–Sink–Erator, 201 F.3d 894, 899 (7th Cir. 2000)), aff'd, 334 F.3d 318 (3d Cir. 2003). Stated differently, "when accommodations are at issue in an ADA claim, the burden is on the employee or a representative to inform the employer of both the disability and desire for an accommodation." Drozdowski v. Northland Lincoln Mercury, 321 F. App'x 181, 185 (3d Cir. 2009) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999) ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.")). "The employer must then show that the proposed accommodation was not reasonable or would have caused it undue hardship, or that the employer proposed a reasonable accommodation that the plaintiff rejected." Solomon, 882 F. Supp. 2d at

779.

Plaintiff contends that Defendant's duty to participate in the interactive process was triggered by his FMLA leave for stress, his request for a transfer, and Defendant's knowledge that he was under severe stress. As noted above, "[t]he employer must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation.'" Mills v. Temple Univ., 869 F. Supp. 2d 609, 622–23 (E.D. Pa. 2012) (quoting Conneen, 334 F.3d at 332 (further quotations omitted)). Plaintiff, however, fails to produce any evidence that he ever informed Defendant of both his disability and desire for an accommodation. Plaintiff testified that after he received his five-day suspension but before he went out on FMLA leave, he requested a transfer as follows:

A.    . . . I went to Debbie McCarty who is the deputy commissioner of the Water Department. I had an impromptu meeting with her, and she actually told me that—well, first of all, she couldn't understand how could I have gotten suspended five days without a hearing or a verbal warning, and then she said she would help me.

Q.    I want to back up just a little bit. You said that you went to Mr. Collier and Ms. McCarty about the situation. What situation are you referring to?

A.    Well, the discriminatory treatment I was receiving, that situation.

Q.    And she said she could not understand how you were suspended?

A.    Yeah, suspended for five days without a warning.

Q.    Okay. And then what happened next?

A.    Well, I asked her for a transfer.

Q.    When was this?

A.    This was in 2010.

Q.    Do you know what month?

A.    Not offhand.

Q.    Where did you want to be transferred?

A.    I wanted to go to Baxter Water Treatment Plant.

Q.    And did she grant your request?

A.    No, she did not.

Q.    Did she give you a reason for not granting it?

A.   Well, she didn't technically grant me the request.  The request I was told when I was to return back to work that they didn't want me.

Q.   Baxter?

A.   Yes.

Q.   Who told you that?

A.   Maxine Maluzo, because of my record, my evaluation and my suspension.

(Lucas Dep. 84:9–85:23.)  Although Ms. McCarty could not specifically recall Plaintiff's request for a transfer, she explained the transfer process:

A.   Well, with transfers, typically we leave it upon the employee to identify a location that will accept them.  The challenge with transfers is that many times an employee is in trouble with his current supervisor and he or she wants out.  The receiving [department] doesn't want a problem employee [text somewhat illegible].  But that's not always the case.  And if there's another unit that would want to accept Rob as a transfer, we would entertain that.

Typically, we would—again, it depends upon the circumstances.  We would allow him to transfer if we could get a replacement to fill his vacancy.  If there is a situation where there's any sort of discrimination or harassment issue going on at the unit that employee is in, that's a whole nother [sic] ballgame.  But if an employee wants out, is asking for a transfer, I would have told him that you would have to find where and get the permission of both units.  As a rule, if you don't want to work in a unit you're in, you know, the supervisors don't want to keep you because that's just going to be trouble for everybody.  So we try to do what we can do, but we don't run around looking for where you can transfer.  That's more on you.

(McCarty Dep. 21:19–22:17.)  Notably missing from any of this testimony is an indication that prior to his transfer request, Plaintiff ever informed Ms. McCarty, or anyone else at the Philadelphia Water Department, that he was under any kind of disability due to stress or anxiety. Indeed, Plaintiff indicated that the first time he visited any mental health providers and received any type of diagnosis was after his hospitalization and, in turn, after he requested a transfer. (Lucas Dep. 106:1–6.)  Accordingly, when he made his request for a transfer, nobody at the Water Department would have had any reason to believe they should follow anything other than the normal procedure described by Ms. McCarty.

Thereafter, on September 14, 2010, Plaintiff was taken to Roxborough Hospital emergency room for what appeared to be an anxiety attack. After that episode, Plaintiff never requested any further accommodation, aside from FMLA leave, from the Defendant. In fact, he explicitly testified as follows:

> Q. Okay. After you visited Roxborough emergency room, did you request an accommodation from the Water Department?
> A. In terms of what?
> Q. Did you notify the department that you had some type of disability.
> A. The only thing that I asked the Water Department was I requested a Family Medical Leave Act.
> Q. And the department granted that request, correct?
> A. Yes.

(Lucas Dep. 103:20–104:7.) After that hospitalization, Ms. McCarty recalls meeting with him sometime in November and recognizing that he was under some sort of stress. (McCarty Dep. 15:5–16:6.) Plaintiff did not, however, reiterate any request for a transfer or other type of accommodation due to his disability. Shortly thereafter, on December 7, 2010, Lucas sent a note to the Water Department that stated, "I am choosing to opt for early retirement @ this time effective 12/7/10." (Def.'s Mot. Summ. J., Ex. 22.) Defendant honored his request and granted him early retirement as of that date. (Id., Ex. 23.) Only after that time did Plaintiff's treating physician indicate that Plaintiff suffered from a disability and could not work in a stressful environment. (Id., Ex. 24.)

In short, based on his own admissions, Plaintiff cannot succeed on his failure to accommodate claim. Although he requested a transfer prior to his hospitalization, he gave no indication at that time that it was for anything other than a dissatisfaction with his supervisors. When Defendant was finally made aware of Plaintiff's anxiety condition—subsequent to his

hospitalization and his beginning treatment with mental health providers—Plaintiff requested only FMLA leave, which Defendant promptly granted. On the date that his FMLA leave expired, December 7, 2010, Plaintiff did not seek any further accommodation, but simply indicated that he was taking early retirement. As there is no genuine issue of material fact on these points, Plaintiff cannot succeed on a failure to accommodate claim.

## IV.     CONCLUSION

In light of the foregoing, the Court grants Defendant's Motion for Summary Judgment in part and denies it in part. To the extent Plaintiff asserts a hostile work environment claim, he has adduced sufficient evidence to survive summary judgment review. That evidence, however, is insufficient to create a genuine issue of material fact on whether the hostile work environment resulted in a constructive discharge. As to his disparate treatment claim, Plaintiff has not only failed to make out a prima facie case, but has failed to show that Defendant's legitimate, non-discriminatory reasons for the adverse employment actions were pretextual. The same holds true for his retaliation claims. Accordingly, summary judgment is granted on these causes of action. Finally, with respect to his ADA claim, Plaintiff has not created any genuine issue of material fact regarding Defendant's failure to accommodate. Therefore, the Court shall dismiss all causes of action in this case, except for Plaintiff's hostile work environment claim.

An appropriate Order follows.